Brian J. Hembd (CA Bar No. 304133)
BHembd@dickinson-wright.com
Joshua Grabel (*pro hac vice forthcoming*)
JGrabel@dickinson-wright.com
DICKINSON WRIGHT PLLC
1850 N. Central Avenue, Suite 1400
Phoenix, AZ 85004
Tel. 602-285-5000
Fax 844-670-6099

*Attorneys for Plaintiff Let The Voters Decide, LLC*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| LET THE VOTERS DECIDE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> COMMITTEE FOR THE RECALL OF DISTRICT ATTORNEY GEORGE GASCON, CASSANDRA VANDENBERG and J. DOE VANDENBERG, a marital community, <br><br> Defendants. | Case No. 2:22-CV-05115 <br><br> **VERIFIED COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Let the Voters Decide, LLC ("LTVD") submits the following Complaint against Defendants Committee for the Recall of District Attorney George Gascon (the "Committee") and Cassandra Vandenberg and J. Doe Vandenberg (collectively "Vandenberg") and alleges, based upon personal knowledge, information and belief as follows:

## PARTIES

1. LTVD is a limited liability company with its principal address in Florida.

COMPLAINT

LTVD is in the business of collecting petition signatures for state and local ballot measures nationwide.

2. Defendant Committee is a political recall campaign committee located in California.

3. Tim Rosales, Gregory Foster, and Defendant Vandenberg are principals (the "Principals") for the Committee.

4. Upon information and belief, Tim Rosales, Gregory Foster, and Defendant Vandenberg are residents and citizens of California.

5. Upon information and belief, J. Doe Vandenberg is the spouse of Defendant Cassandra Vandenberg, and the actions of Cassandra Vandenberg were undertaken for and on behalf of the marital community consisting of Cassandra Vandenberg and her respective spouse, if any.

## JURISDICTON

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. The Court has personal jurisdiction over each of the Defendants because they are residents and/or registered to and do conduct business in the state of California.

8. The Court additionally has personal jurisdiction over the Plaintiff and Defendants pursuant to the agreement executed by Plaintiff and Defendants.

## VENUE

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all Defendants reside in California and at least one Defendant resides in this District.

10. Venue is additionally appropriate in this district pursuant to the agreement executed by Plaintiff and Defendants.

# FACTUAL BACKGROUND

### A.  The First Professional Services Contract

11. On or about February 9, 2022 Plaintiff LTVD and Defendant Committee entered into a Professional Services Contract (the "PSC"). Despite a herculean effort by LTVD to accomplish the Committee's goals, and complete compliance with the PSC by LTVD, the Committee and Vandenberg failed to uphold their end of the bargain, breaching the PSC and falsely inducing LTVD to go above and beyond.

12. As stated in the PSC, LTVD and Committee entered into an agreement so that Committee could retain and have available LTVD, a company with a successful track record and years of relevant experience, to help further its political interests in California.

13. The Committee was attempting to obtain enough signatures to force a recall election of Los Angeles District Attorney George Gascon ("the Recall Effort"), and LTVD was hired to work at the Committee's direction by using its network of signature collectors to assist the Committee in obtaining 400,000 signatures at 75% validation rate, for a total of 300,000 validated signatures, by May 4, 2022 for the Recall Effort. LTVD was to be paid per signature obtained, pursuant to terms that were initially outlined in the PSC, but that were subsequently amended by the Parties once LTVD has accomplished the terms of the PSC. LTVD was hired for its expertise and capabilities in obtaining signatures in similar matters across the country, but how and where it implemented its efforts were directed by the Committee during the signature collection process. Defendants made one false step after another, but continued to guarantee LTVD that the Committee would uphold their promises and obligations to LTVD. They failed to do so.

14. The Committee also needed to implement a process for validating signatures collected by LTVD and, as necessary, correcting signature petitions in a manner that was consistent with California law. However, the Committee was initially not relying on LTVD (or anyone associated with LTVD) to do the Committee's validation. Rather, the Committee initially retained a company named C-3 to perform its independent validating services. C-3, who was woefully unqualified to perform this function, failed to do so in an adequate way,

and, upon information and belief, failed to fulfill their obligation to perform the Committee's independent verifications of signatures.

15. In addition to the problems that the Committee had with its validation efforts, during the term of the PSC, Defendants made multiple strategic decisions related to the collection of signatures that were directly against LTVD's recommendations as to how to proceed. For example, against LTVD's recommendations, Defendants lowered the price they were willing to pay signature collectors during a time where the market demanded that, to prevent those individuals from leaving, Defendants maintain or increase the prices paid.

16. Defendants also refused to pay the market rate for signature collectors, rationalizing that it did not need to do so given the number of petitions that were being circulated at the time. LTVD advised the Defendants that these tactics were likely to result in severe issues with their signature collection efforts, as it would both cause signature collectors to leave for other opportunities in other counties or states that were paying market rate, leave for other opportunities, and cause them to lack confidence in the efforts of the Committee to effectively and appropriately pay for signatures on a going forward basis.

17. Defendants also decided to shift resources towards collecting signatures through a direct mail program, despite the fact that LTVD specifically advised the Defendants that this was very unlikely to be successful. As a result, Defendants' actions led to the Committee falling substantially behind on its signature collection process.

18. Even as it became clear that the Recall Effort was behind on its efforts to collect signatures and that its plan to use mailers to obtain a substantial number of signatures was failing, the Committee continued to direct LTVD to pay less than market rates against LTVD's continued advice. This caused substantial problems on collections of signatures.

19. As a result of these failed strategic decisions by the Committee, the Recall Effort fell substantially behind in collecting signatures on a schedule that would allow it to submit sufficient signatures to be successful. Despite the Committee's on-going failures, LTVD still collected the amount of signatures, including validated signatures, and completed the terms set forth in the PSC.

20. In or around May 2022, it became clear that C-3 was failing in its validation efforts and C-3's failures on behalf of the Committee were making it difficult for LTVD to proceed. LTVD provided the Committee with contact information for its signature validator, Allied Data Services ("Allied"), and offered to allow the Committee to use Allied as its validator (rather than as LTVD's internal validator). LTVD was subsequently informed that the Committee was using Allied as its signature validator, indicating that Defendants would be paying Allied to validate the entirety of its collection effort. Accordingly, and to speed up the process, both LTVD and the Committee had access to Allied's verification data. As a result, there was no reason for LTVD to pay Allied to validate the same signatures the Committee would also separately send Allied. This was especially true given Defendants' requests for expedited signatures, including a personal request from Defendant Vandenberg so that she could report more signatures to the Committee's donors.

21. In May 2022, the Parties also agreed that LTVD had completed its performance on the PSC and that the PSC itself was completed.

22. After LTVD completed performance under the PSC, Defendants still wanted LTVD to continue to obtain additional signatures. Though a draft of a new agreement was prepared, given the necessity to be flexible in adjusting to the Committee's needs, and because the Committee refused to agree to certain terms requested by LTVD, the Parties instead decided to move forward based on terms that were agreed to via text and verbal communication (the "Agreement").

23. In June 2022, knowing that the Committee had failed to both collect adequate signatures and to timely pay LTVD for its services to that point, LTVD approached the Defendants about how to move forward in the Recall Effort. Defendants directed LTVD to accelerate its efforts to collect additional signatures related to the Recall Effort, and further directed it to increase the amount to be paid to signature collectors for their efforts. Further, and importantly, Defendant Vandenberg personally guaranteed that payment would be made to LTVD for these increased efforts on more than one occasion in writing. LTVD did what was asked, making an extraordinary push based on Defendants' promises and guarantees.

24. In exchange for LTVD continuing to provide services to the Committee, the Committee agreed to compensate LTVD at a necessary, and higher, rate per signature, so that LTVD could attempt to make up for the shortfall from the Committee's earlier effort with additional signatures. The higher rate became necessary in part to ensure that signature collectors continued to work on the Recall Effort after other petitions that they were circulating were completed, which would ordinarily have led to the signature collectors moving onto other jurisdictions where active signature collection was on-going and they could be paid more for their efforts. Additionally, as part of this new effort, Defendants agreed to pay performance bonuses to LTVD, all of which would be passed on to the collectors, if it obtained sufficient signatures in the later stages of the collection process. LTVD did, in fact, obtain those bonuses.

25. Other key terms related to the Agreement included additional payment for increased efforts to collect signatures, an understanding that payment would be made in advance based on validation percentages that would involve adjustments of numbers to ensure that the number of signatures that payment was sought for were sufficiently valid under the Agreement, and that LTVD would assist the Committee with correcting petitions through its signature collectors in a manner that complied with California law as part of the Agreement. That process for correcting petitions that have errors was very important, as failure to utilize the appropriate process would result in petitions being denied, and required the involvement of the signature collectors contracted by LTVD *before* those were to be submitted to the State of California.

26. Though LTVD increased its efforts and was able to provide the number of validated signatures contemplated by the Agreement after appropriate adjustments, the Committee fell substantially behind in paying for LTVD's services, and on multiple occasions, the Committee guaranteed payments that were not made on a timely basis, if ever. Specifically, LTVD provided approximately 517,000 signatures to the Committee ("Submitted Signatures"), yet the Committee missed multiple payments, even where it knew LTVD had to pay signature collectors, who were working tirelessly, including over the July 4 holiday.

27. For purposes of calculating payment, LTVD, assuming the Committee's purported validation rate of 65% for the Submitted Signatures is accurate (which LTVD disputes), LTVD obtained no less than 336,050 validated signatures. That means LTVD is entitled to be paid for at least 448,609 valid signatures for payment for Defendants pursuant to the Agreement.

28. Despite this, the Committee continued to fail to make timely payments, making it more difficult for LTVD to keep sufficient signature collectors active and to make payments to them as required. As LTVD made additional demands for payment, Defendant Vandenberg repeatedly made personal guarantees to LTVD that funds were held by the Committee for LTVD's benefit, and that payment would be made, again stating in writing that she was personally guaranteeing that funds were available and that LTVD would be paid. Vandenberg also repeatedly blamed other individuals and/or entities for the Committee's failure to make timely payments as promised. Vandenberg also promised LTVD on multiple occasions in writing that she would personally guarantee payment, and that she would not leave LTVD or its signature collectors hanging. LTVD reasonably relied on these assurances in continuing its work to have signature collectors (who are independent contractors) collect signatures.

29. Additionally, during the Recall Effort's signature petition stage, LTVD asked the Committee when they were going to provide LTVD with any petitions that had correctible errors on them so that LTVD could perform that function for the Committee's benefit. The Committee informed LTVD that doing so would not be happening, because the Committee had (likely improperly) corrected those forms on its own. The Committee's independent decision to alter petition forms against LTVD's advice and without the assistance of LTVD or the petition signature collectors was done solely and exclusively by the Committee and the Principals, and without knowledge of LTVD or the collectors in any way.

30. The Recall Effort concluded, at least at the signature collection stage, on July 6, 2022. On that date, the Committee turned the petitions and signatures, including those

provided by LTVD that the Committee appears to have "corrected," over to the State, with the Committee verifying their authenticity.

31. Defendants paid for the initial 300,000 valid signatures under the PSC, but Defendants have only paid for 116,995 valid signatures under the Agreement. This means that there are at least 31,614 unpaid valid signatures at $14.00 per signature. LTVD also estimates that there is a minimum of 9,000 signatures that are entitled an additional $3.00 bonus amount, which is an additional $27,000. LTVD is only able to provide an estimate of this amount because the numbers have not been made available to LTVD at the Committee's insistence.

32. Defendants have thus failed to meet their obligations and materially breached the Agreement by not paying Plaintiff the amount owed.

33. In total, Defendants owe LTVD at least $469,596.00, before accounting for all unpaid field bonuses.

34. LTVD has requested the payment it is owed and access to the data it is entitled to, and Defendants have refused to comply with the terms of their agreements with LTVD.

## COUNT I

### *Breach of Contract against the Committee*

35. LTVD repeats and realleges the allegations contain paragraphs 1 through 36 as if stated here.

36. Defendant Committee entered an Agreement with LTVD, and LTVD fulfilled the terms of that Agreement.

37. The Committee materially breached the Agreement by failing to pay LTVD the amounts due to LTVD under the Agreement.

38. As a direct result of the Committee's breaches, LTVD suffered substantial losses. LTVD's total damages caused by the Committee's breaches is no less than $469,596.00.

## COUNT II

### *Breach of the Implied Covenant of Good Faith and Fair Dealing against all Defendants*

39. LTVD repeats and realleges the allegations contain paragraphs 1 through 38 as if stated here.

40. Every contract imposes upon each party a duty of good faith and fair dealing in the performance of the agreement.

41. LTVD fulfilled his obligations under the agreements in good faith based on the reasonable terms of the arrangement. All conditions required for Defendants' performance occurred.

42. Defendants unfairly frustrated LTVD's right to receive the benefits of its agreements by failing to perform under the contracts entirely and by, among other things, failing to pay LTVD the amount owed and failing to provide Plaintiff the data that it is entitled to receive.

43. Defendants unfairly interfered with LTVD's right to receive the benefit of the agreements by, among other things, failing to: (1) pay LTVD the amount owed, and (2) provide Plaintiff the data that it is entitled to receive.

44. Defendants' failures to act fairly and in good faith harmed LTVD by depriving it of the benefit the Agreements, causing damages no less than $469,596.00.

## COUNT III

### *Negligent Misrepresentation against the Defendant Vandenberg*

45. LTVD repeats and realleges the allegations contain paragraphs 1 through 44 as if stated here.

46. Vandenberg personally guaranteed that Defendant Recall Committee was holding funds to pay LTVD.

47. Vandenberg also personally guaranteed that LTVD would be paid for its work when Recall Committee fell behind on payments for work LTVD had completed.

48. Vandenberg made personal guarantees to LTVD on behalf of herself and her

marital community, and on behalf of the Committee regarding the Agreement.

49. LTVD relied on these personal guarantees when it continued to perform services under the Agreement.

50. Accordingly all Defendants had the same unity of interest such that the separateness of Defendant Recall Committee and the individual Defendants Vandenberg no longer existed.

51. It would also be inequitable to treat Defendant Committee's failure to comply with the terms of the Agreement as its failure alone.

52. In relevant part, Defendants agreed to pay LTVD consistent with the Agreement.

53. LTVD relied on these representations from Vandenberg in spending significant time and resources retaining signature collectors and agreeing to pay increased rates for the signatures.

54. These representations were not true, and Vandenberg had no reasonable grounds for believing they were true.

55. Plaintiff justifiably relied on Vandenberg for various representations related to payment and data LTVD was to receive

56. Plaintiff relied on these representations, and he was harmed as a result.

## COUNT IV

### Violation of Cal. Penal Code § 496 against all Defendants

57. LTVD repeats and realleges the allegations contain paragraphs 1 through 56 as if stated here

58. Defendants made multiple false assertions about the Committee's capabilities and/or willingness to pay LTVD for the services provided.

59. Upon information and belief, the Defendants knew that the Committee would refuse to pay for the signatures that the Defendants requested LTVD to obtain on a timely basis, and continued to assert that the Committee would do so.

60. Upon information and belief, Defendants had the intention of obtaining

signatures from LTVD while knowing the Committee would not pay for them.

61. The Committee knowingly received these additional signatures from LTVD without paying for LTVD's services in obtaining them.

62. The Defendants materially benefitted from the Committee receiving additional signatures from LTVD which the Defendants had no intention of paying for.

63. The acts of the Defendants constitute a violation of Penal Code § 496(a), thus entitling LTVD to recover treble the amount of actual damages along with LTVD's costs of suit and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court grant judgment in his favor and against Defendants and prays for the following relief:

(a) Awarding all damages related to any of the claims or allegations outlined above, including but not limited to treble and or punitive damages, in an amount to be proven at trial, but not less than the amounts specifically claimed herein;

(b) Awarding attorneys' fees and costs to the full extent permitted by law; and

(c) Providing all such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial of his claims by jury to the extent authorized by law.

Dated: July 25, 2022.

**DICKINSON WRIGHT PLLC**

*/s/ Brian J. Hembd*
Brian J. Hembd (CA Bar No. 304133)
BHembd@dickinson-wright.com
Joshua Grabel (*pro hac vice forthcoming*)
JGrabel@dickinson-wright.com
1850 N. Central Avenue, Suite 1400
Phoenix, AZ 85004
Tel. 602-285-5000
Fax 844-670-6099

*Attorneys for Plaintiff Let The Voters Decide, LLC*

COMPLAINT                                11

## VERIFICATION

I, Mark A. Jacoby, am the Founder and Chief Executive Officer of Plaintiff Let the Voters Decide, LLC. I have read the foregoing Complaint and state under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge, information, and belief, except for those allegations that are made upon information and belief, which I am informed and believe to be correct.

Executed July 25, 2022

_____
Mark A. Jacoby

COMPLAINT                                    12